Good morning. May it please the court, Mack Lacey on behalf of Appellants, the Oregon Natural Desert Association and Center for Biological Diversity. With me at council table is David Becker. I'd like to reserve three minutes of my time for rebuttal and I'll keep an eye on the clock. Thank you. Native bull trout are disappearing from the Malheur and North Fork Malheur  with fewer than 50 fish left in each river today. Councilman, I hate to interrupt you but we don't have a lot of time. So this this litigation has been going on for about two decades and there have been several cases that involve substantially similar claims. In all of them except one which had it's kind of an ambiguous result, you lost. You have a plan, if you will, that covers things that are supposed to be done including protecting the bull trout. The government says under our plan, you know, we're monitoring this and we're making changes as we need it. You say it's not enough under a case I'm very familiar with, Lands Council versus McNair. Why isn't that enough? I think this case comes down to three basic principles of administrative law as articulated in the en banc decision in Lands Council versus McNair in 2008. One, the Forest Service has to address all, not just some, of the information before it. Two, the Forest Service has to explain, not ignore, conflicting information when information is pointing a different direction. And most importantly, third, the Forest Service has to do these things before its decision authorizing an activity on national forest lands, not years later through post hoc statements and litigation declarations. And this case comes down to the Forest Service being unable to point the court to anywhere in the record where it's satisfying its substantive obligation under NIFMA section 1604I to actually analyze and show, that is make it a determination, an articulation as to why the approved grazing activity will ensure compliance with these binding Forest Service standards for habitat and for population. And in this case, let me just, I'm sure I understand your argument, but we said in Lands Council among other things is, people are gonna disagree. There's not always gonna be agreement, but we aren't experts. We have to rely upon the experts in the government agencies, and as long as they address the claims that are made and come up with something that doesn't sound basically ridiculous based upon the facts, we're gonna rely upon them. They say, hey, we know about the bull trout, we've got a and down, but we are monitoring it. We got within the confines of the plan, we have means to take care of it. That's where the other cases that I referred to have concluded as well. What's different about this? Well, the court can't just defer to monitoring. There's nothing for the court. I just pulled out of one of the elements, not that that's the only thing. Precisely, there's nothing for this court to defer to in the facts of this case, because yes, there is monitoring data in the record, and it's a voluminous record to be sure, and there are different types of monitoring data. You can call it monitoring. I called it an alternative measuring technology, an alternative means to assess the consistency. Now, that's bigger than monitoring. I know you want to make it into monitoring in your argument, but I don't think it is simply monitoring. I actually don't want to make it into a monitoring argument. Our position, Judge Smith, is that yes, the Forest Service has collected a few different types of monitoring data. There's the RMO findings, there are the PBO findings, there are the annual habitat indicators. So yes, the Forest Service collected some information. And with this collection, they have acted. They have acted to collect information, but what is lacking in the record here, Judge Smith, is an articulation at some point contemporaneous, that is, before the decision to take action, before the cases from Lands Council all the way up to Alliance for the Wild Rockies make clear, not just as a matter of the NIFMA consistency provision, but as a matter of basic administrative law. An agency has to show its work before acting. Well, with respect, I get your point, but you would agree, would you not, that there are lots of cases that show that Forest Service in this instance, other agencies in other instances, can create within a forest plan and then within NEPA et al., etc., rather, a kind of an umbrella approach that allows them on a, if you will, an ad hoc basis, individual things occurring, to apply the principles and the overall plan to that particular event. Do you agree with that? I agree with that as a general matter. I mean, that's what the law provides, is it not? That an agency has to show its work for how it intends to proceed with making a decision. And then it addresses individual data and events that want to occur. Now, no, that's not here, but for example, we have a lot of cases recently, we're up on the North Slope, you've got an overall plan that had been approved by the courts for some drilling a long time ago, and then they have to file individual NEPA updates, etc., etc., etc., to do individual wells. I'm not saying it's good, bad, or In this case, we're not talking about oil wells, we're talking about protecting fish, etc., etc. The government, as I read the record, says, well, that's exactly what we've done. We know about the bull trout. We're concerned. Our plan says we're going to take care of it. These are some things that we've done. You're saying, well, I haven't done enough. Is that a fair statement? No, Your Honor. I would disagree with articulating it. We're not arguing they haven't done enough. What we're arguing is that the only place where the Forest Service is explaining its interpretation of all of this information it's collected are through these post hoc declarations and through these PBO reports, which, remember, didn't come into being until 2015 and 2017. So, none of that information existed at the time any of this decade's worth of challenged decisions exist, and it's telling. You shouldn't use more modern technology to I'm sorry, Your Honor. I mean, facetious. I was suggesting you're you're saying they shouldn't use more modern methods of communicating to folks. Well, what I'm saying, Your Honor, is that in this case the Forest Service being unable to point to any simple consistency analysis in the record needed to generate litigation declarations, needed to generate information drawn from post hoc PBO reports, and even the PBO data, if you look at it, is not reliable because at ER 456, the Forest Service explains that if there are fewer than 10 monitored sites under this protocol, then there's no quote statistical confidence that that information tells you anything. At SER 259, the Forest Service's own expert, Mr. Archer, explains that there's only one monitored site in both of these river basins, and they established eight new ones in 2014. So there's no statistical confidence that the main piece of data the Forest Service relies on years after the decisions tells us anything. Again, I don't mean to argue with you. I'm just trying to understand your position. This is a classic situation, just like we had in Lands Council. You have some, you're really good. Your people are really good. The government is good. They do all their best, and you're never going to agree. It's extremely, well, it's extremely rare that you're going to agree. And so, what we said in Lands Council is, as long as you're addressing the issues, the same issues, if the government does that, it can proceed with what it's proposing. You're saying, we don't agree with what they propose. Okay? That's, but that's what Lands Council was about. And if we jump forward to Alliance from the Wild Rockies, one of the more recent NIFMA cases applying Lands Council, the court said specifically that highly technical discussions of vegetative conditions are not something that this court can reasonably be expected to review, nor that isn't something that's entitled to deference. We're not scientists. That's why we have to go rely on the agency, unless they don't address the points that you make at all. That's right, and that's the case we have here, because the only explanation in the record is in the What do I make of the idea that the U.S. Fish and Wildlife Service concurred there would be no adverse impact on bull trout, or in the areas where there may be an adverse effect, grazing would not jeopardize the survival of the bull trout, or result in the destruction or adverse modification of critical habitat? What do I do with that? Well, the U.S. Fish and Wildlife Service biological opinion is a decision issued under a separate law, the Endangered Species Act. I know what it is. I know exactly what it is. I'm asking, what effect do I make of that in this particular case? Well, I mean, here's the people specifically, in my book, delegated the responsibility for the bull trout, and they say, having looked at the whole thing, I know it was in a different circumstance, I know where it came from, I just want to know what effect do I do with what they've said? I mean, they're delegated the responsibility, and they say, Judge, there's no adverse impact on bull trout, and furthermore, in areas where there may be an adverse effect, grazing wouldn't jeopardize it. Right, Your Honor, but what the Fish and Wildlife Service is looking at is whether the action being proposed by the Forest Service is going to cause the species to go extinct across its entire range. So the Fish and Wildlife Service's determinations in the biop... Just because you're saying they are only looking whether the trout would go extinct, but in this situation, we're trying to make the trout... I don't find anything in this plan that says the bull trout population has got to increase. Are you referring to the Fish and Wildlife Service biological opinion? I'm referring to the plan that I have in front of me. The Malheur plan? Is that my... The forest, I'm sorry, the forest plan. Malheur? Yes, yes. Well... I mean, I think it means a bad hour, doesn't it? It means... There you go. It just means bad. Malheur and Bunner, good or bad? Okay, the bad forest plan, that's what I call it. Okay. We actually think it's a very good forest plan, just that the Forest Service is not following the plan. But the point with regard to the biological opinion and the forest plan, the Forest Service has its own independent substantive duty under 16.04i to ensure that any activity it allows on the Malheur National Forest is consistent with binding forest plan standards. And remember, these are standards, so we require strict compliance. And so the level of deference to the agency is a little bit lower. And Judge Smith, you wrote in one of the recent pollinator stewardship council cases that the arbitrary and capricious standard of review hurdle is low, but it's a hurdle nonetheless. The agency can't just walk around it. Well, that's why I said, what effect do I give to this? Because to be fair, that doesn't help you. Well, the key finding in the biological assessments as part of that consultation process between those two agencies is that RMOs are getting worse, not better. From 1999 to 2012, it's undisputed on the record that the RMOs are all failing and going downward. And that's inconsistent with what the Forest Service's experts are telling us, the PBO data and the annual habitat monitoring data are telling us. Where there's an inconsistency, the Forest Service has to address that and explain why it thinks its decision to go forward with the action is reasonable. And even in the post hoc expert declarations, the experts don't address the failing RMOs at all. You'll find no explanation in those declarations as to why that inconsistent information correlates, how it connects to the other information. And I do see that I'm below. You are. I got one more question. You cited to me Pacific Coast Federation fishermen versus natural marine fisheries. And I thought, well, here's a case I can go right to it and look at it. And like the forest plan here, NFISH doesn't require RMOs to be evaluated in the short term on a project level like it did in that case? No, the standard, of course, is GM1. But the whether or not to modify or whether or not to suspend grazing are the RMOs. Now, the Forest Service, of course, can look at other types of information to get an idea. But in this record, they also did make RMO findings. But they decided to put aside those inconvenient findings. But that's giving them too much credit because they never decided that when they made the decisions. They only decided to ignore them in the expert declarations later. Okay. I didn't want to save the time. We'll give you a little extra time. But we may have some additional questions as well. Okay. Thank you. Very well. We'll give you some rebuttal. Good morning. Good morning. May it please the Court. Brian Toth from the Department of Justice representing the Federal Defendants Appellees. I intend to speak for 10 minutes. And we'll attempt to leave five for my co-counsel for the intervener appellees. Congress has directed the Forest Service to manage the National Forest both for grazing. Hold on one second. I can't hear him very well. Can we turn up the volume a little bit? Or maybe put the mic down? Okay. We want to be sure that your audience, they're looking at you. We want them to be able to hear you. Very well. Is this better, Your Honor? Yeah, it is better. It is better. Congress has directed the Forest Service to manage the National Forest both for grazing on rangeland and for Fish and Wildlife Service purposes. It has done so here. And the Forest Service has gathered and has considered throughout this long-running history of the challenge. And I would like to emphasize that this is a very broad challenge. Whether or not you agree with our arguments that it's prohibited as a programmatic challenge, I think the breadth of it gives some context for the arguments that are presented here. It covers a decade's worth of decisions, which encompass about 120 agency actions that have been identified. I gather part of your point is it's just too broad. They've got to be more specific in the challenge. Is that correct? Yes. And also that a lot of the argument that you heard from my friend about, well, they have to evaluate this science at every point before they make each and every one of those 120 different decisions is just simply not feasible in the context of this ongoing activity, grazing. It's very different from projects like timber sales or restoration projects where things are built or cut on the forest and it's done. And the private individuals move on. The Forest Service moves on to another project. But grazing is a long-term ongoing activity. In some cases, it's been conducted on these same allotments for the entirety of the time the National Forest has been a national forest, 100 years or so. And so to deal with that problem, Congress has, and I say problem, to deal with the nature of that ongoing activity, Congress has expressly recognized that grazing is different, and specifically in the context of environmental assessments and analyses under NEPA, the National Environmental Policy Act. We cited the 2014 public law that amends Title 43 United States Code 1752 C1 and H and I. And what those provisions provide is that the timing of NEPA analysis is largely left to the full discretion of the Forest Service. And a lot of these issues, not just with NEPA, which is not directly an issue here, but with compliance with the Forest Plan, are surfaced during the public involvement process that NEPA provides the framework for. So because the Forest Service is allowed to use its discretion to decide when to conduct new NEPA analyses for this ongoing activity, some of these issues are not surfaced in the public way that we might see in timber sale decisions. And so the agency is left to issue these annual instructions each year to the grazing permittees. And it does have to assess consistency, it does have to make sure its decisions are consistent with the Forest Plan, but the way that it does that is going to less formal by the nature of the decision-making than for a longer-term project like... I wanted to clarify exactly what the decision-making was in the analysis. Did the Forest Service do site-specific analysis to ensure compliance with the plan? It does so, it does, it does do site-specific analyses and I guess evaluation. The annual letters that it issues are a way that it looks at the conditions on the range each year and it discusses with the permit holder what changes need to be made, for example, to the number of cattle that are grazed in a particular area or the duration of the grazing for the season. Is site-specific analysis required? I don't think that the type of analysis that they're asking for is required. I think the court can rely on other evidence in the administrative record to infer what the Forest Service's reasoning was. The Forest Service issues these letters. They're about three and a half pages. A lot of them are in the record. Volume 2 of the excerpts of record has some examples. They're very informal. To require the Forest Service to do an express written determination assessing all these factors and all these Forest Plan standards each and every year for each and every allotment just would be impractical. So is this different than the Native Ecosystems case that the plaintiff cites? Yes, in that that case involved allotment management plan updates. There are some allotment management plans that are in the mix here in these 120 decisions, but there are also a lot of these different informal annual operating letters too. So I think because of the breadth of the challenge, I don't think that this court ought to at all these decisions the same way and require express consistency for this potpourri of different types of decisions at the same level you'd expect for a 10-year grazing permit, for example, where they might be doing a NEPA document. And I would submit there is a place for the plaintiffs to request through the NEPA public involvement process that the Forest Service look at Forest Plan consistency under the National Forest Management Act. NEPA provides that it should be a way for the agencies to integrate requirements of other environmental laws. But NEPA usually would have application before the Forest Plan was adopted, right? That's right. That's a long time ago. That's right. So how does that help them? Not necessarily before the Forest Plan is adopted, but when the Forest Service uses its discretion under the 2014 public law to prepare the analyses and, you know, the information... Actions, if you will, that require supplementation of the NEPA plan. Yes, that's right. So that might be an appropriate place for them to request that type of express response to comments and where the Forest Service could take more time to put pen to paper and spell out its reasoning. But I think under the standards of the APA, the record here is more than adequate to support a conclusion that the District Court held, which is that the Forest Service complied with the Forest Plan standards and that it's supported by enough evidence in the record to support a rational conclusion to that effect. Does the government take the position that the very breadth involving, I think you said, 120 decisions is too much? That it has to be narrowed down in order to be litigated? Or could they expand it so that it involved, you know, 50 years with 3,000 decisions? Is there a limitation? Well, we think even what they brought is really just a programmatic challenge couched as a pattern and practice claim. And we don't think those are cognizable. We've made that argument. The District Court rejected it. We made it again in our appellate brief. And I would rest on our brief on that. So we don't think it's the correct way to bring an APA case. But even so, even accepting the claims as they've pled them, we think there's a reasonable path, a rational path that the Forest Service followed in its decision making that's supported by the record. And I would point the Court to two documents in particular that the District Court relied on when adopting the findings and recommendation of the magistrate. It's on page 8 of the excerpts of record. The District Court cites, and these are... Did you say 8? Yes. That's the second full paragraph toward the middle where there are some citations to various record documents. The first one is to SCR 1989. Now, it doesn't say that there, but I'm converting the site. It's volume 8 of our supplemental excerpts of record. And it's to what's called the PIBO data, the effectiveness data. And that is, it's not the litigation declaration that my friend was referring to. It's the charter from when the long-term monitoring program was instituted in 2002. And it explains that this monitoring program, it's an interdisciplinary monitoring program. It includes various different agencies. It was developed with the sole purpose of demonstrating long-term, evaluating the long-term trends and status of the Forest Service's compliance with this forest plan requirement that's at issue in NFISH. The second document is cited later on that same page. It's supplemental excerpt of record 4665 from volume 18 of the supplemental excerpts of record. And it is from... I believe that's... Unless I got these backwards. I may have gotten these backwards. But one is from the biological assessment that the Forest Service issued in the midst of these decisions. And it also is not pre-decisional. It's not our litigation declaration. And it provides the reasoning that I think is adequate to support the Service's conclusions here. You going to leave your buddy over there some time? Yes. I think he's anxious. Good morning. Good morning, Your Honor. Scott Horngren from Western Resources Legal Center on behalf of the ranchers in this case. Appellants claim the Forest Service is arbitrary and capricious because they didn't analyze and show how grazing is consistent with the forest plan direction to protect riparian areas and promote recovery of bull trout. However, the record in spades refutes Onda's assertion of a void in analytical and consideration of the effects of grazing on riparian resources. It's not just the declarations. And we have 20 volumes here of numerous year-end monitoring reports, scenic river monitoring, annual monitoring that occurs on the allotments. The Onda has argued that, well, this hasn't been done before the agency acts.  It's different than a timber sale where a contract is granted. You go out and cut the trees. Grazing occurs usually over a four or five-month period, sometimes only two weeks in the pastures within the allotments. And there are constantly decisions being made throughout the season depending on how high the grass is, what's going on with the shrubs, if it's a drought year, if there's a lot of water in the streams. And the Forest Service is out there in the field taking measurements. They have what they call endpoint indicators and move indicators, habitat indicators that would say if the grass gets down to six inches, you got to move the cattle. Do they do a forest plan consistency analysis before they make that decision? No, they document it in an inspection report, but it's a one-page inspection report and not a 10-page analysis of the various... Let me ask you a specific question related to the kind of work you're talking about. It seemed pretty clear that the bull trout population appears to be declining in allotments. At what point does the Forest Service, under the in-fish standard GM-1, obligated to suspend grazing in order to allow the bullfish populations to recover? I don't... Anywhere? Yes. They are required to suspend grazing if, in terms of the bull trout, I would argue after a long-term assessment, and they are doing long-term assessments through what government council explained about how the effectiveness of the fencing and the moving of the cattle and having riders is doing. And in particular, in this case, we have a somewhat unique situation where we have this endangered species and there's consultation with the Fish and Wildlife Service. Okay, but I want you to answer my question. Okay. At what point is the government obliged to stop the grazing in order to protect the bull trout under the in-fish standard? I would argue if the monitoring is showing long-term over a 15- to 20-year period that nothing's happening and the bull trout aren't recovering, then maybe they could stop grazing. But the problem is the Forest Service could do everything in their power to improve the habitat, and the bull trout still couldn't recover. True. But I guess what I'm understanding you to say is that there's really no trigger point, per se. There is no trigger point. And the Fish and Wildlife Service estimated that bull trout recovery may take up to 25 years or longer, and that's at Intervenors Supplemental Excerpt of Record 10. That was in 2002. And their biological opinion in 2012, the Fish and Wildlife Service estimated it would be 10 to 20 years for improvement to occur in the hardwood shade component, and that's at SER 19999. And so this is truly a long-term endeavor. But the Forest Service is just not turning cattle out and coming back in 20 years. They're monitoring every year. If they find exceedances, they document it in the grazing permit files and the year-end reports. And they are – go ahead. Do the documents between the ranchers, the farmers, and the government permit the government to require the ranchers to stop putting their cattle out there if they're so advised? And the Forest Service has done that, and you'll see in the record there are letters saying you've got to reduce your grazing intensity next year 25 percent. There are some cases, a particular case, where the rancher was said, you're not doing the job right, and you're done. Your permit is done. And so the Forest Service, in response to the monitoring they're doing yearly on the allotments, is taking – Do you have any specific examples within the Maluwa Forest and others that your opponents are referencing where a rancher has been told to stop? Yes. Is there anything in the record? Yes. And – Where is it? For example – and I'll give you the record site. I don't have it. But there are – an example is on an annual basis. Particularly for the pastures near the streams where the bull trout is, the Forest Service range manager will come in and they'll say, we see cattle in this pasture. It breached the fence. You need to move your cattle and stop now. Your time is up. Will you send us a 28-J letter, of course, to the opposing council? Yes. We'll give them a chance to rebut it if they don't like it. Sure. But that shows instances within the time period we're talking about here where the Forest Service has told a rancher, stop putting cattle here or reduce the number. Yes. I'd be happy to do that, Your Honor. And one other point, in terms of just through the season, there will be times when the grass is grazed enough where they'll also tell them to stop and you need to move. Sure. Okay. Thank you very much. So he only had 100 – I mean, an hour and – no, what am I talking about? A minute and 12 seconds. We'll give you two and a half minutes. So let's flush him up here a little bit and give you a little bit of time. I appreciate that, Your Honor. Let me begin with one point. NFMA requires the Forest Service to ensure consistency for grazing, just like any other use or occupancy on the National Forest. And the point I want to make is, it's not an onerous burden. And ONDA is not asking for any particular methodology or format, but we have examples in the record at SCR1, SCR721 of places where the Malheur National Forest actually did do an explicit consistency analysis. So at FER1, for example, it's a five-page analysis explaining why that particular 43,000-acre logging project in that example was going to comply with all of the various forest plan standards that were binding for that project. SCR21 is an even easier example. It's a one-page analysis showing why a riparian planting project was going to be consistent with forest plan standards. The Forest Service has an existing process in place for how it administers grazing permits and annual grazing decisions. So it's not like the plaintiffs are asking for some brand new process to be invented, and certainly not for this Court to tell the Forest Service what kind of process. My point, more, is that a process exists. And the reason there are so many decisions challenged in our complaint, 117, is because we've had to keep this case going for so long. And the complaint covers a decade's worth of decisions. But if you break that down, that's just a handful of decisions every year that the Forest Service is administering already. But what's missing is the Forest Service connecting the dots, showing its work each time it decides to allow more grazing in the same places where its own findings are showing that RMOs are getting worse, not better. The second point I wanted to touch on was the annual indicators. This is the type of monitoring that the Forest Service does more than the other two types, even. But the problem is that those indicators, those annual measurements, are showing that the Forest Service is unable to meet its annual trigger standards most of the time on every allotment year after year. And those indicators are what tells the agency, by its own definition of what a near natural rate of recovery is under GM1, the standard GM1, those indicators tell the agency whether effects are carrying over to the next year. And remember, if effects are carrying over to the next year, the Forest Service says, well, that means that we are not achieving a near natural rate of recovery. That's when modify should kick in and suspend, ultimately, under the facts on this record. OK. Let me ask either of my colleagues to have an additional question. Thank you. All right. Thank you for your argument. Thanks to all of you. We appreciate it. On behalf of the bull trout, we thank you. And the case just argued is submitted.
judges: M. Smith, Jr., N.R. Smith, Tunheim